# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-DR-00978-SCT

*DAVID COX*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| TRIAL COURT ATTORNEYS: | BENJAMIN F. CREEKMORE |
| | JOHN KELLY LUTHER |
| | THOMAS ROY TROUT |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: KRISSY C. NOBILE |
| |     BENJAMIN H. McGEE, III |
| |     TREASURE R. TYSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 10/21/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## consolidated with

## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00515-SCT

*DAVID NEAL COX*

*v.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: KRISSY C. NOBILE |
| |     BENJAMIN H. McGEE, III |
| |     TREASURE R. TYSON |
| |     BRANDON KYLE MALONE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| |   BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 10/21/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. The matters[1] before the Court today began with a motion[2] for post-conviction relief filed by CPCC on behalf of Cox, which was assigned Cause No. 2015-DR-00978-SCT. That motion was followed by a series of pleas by Cox to dismiss his appeals, dismiss his counsel, and set an execution date.[3] Subsequent to those pleas and on motion by the State, this Court

---

[1]All matters pending before the Court in the above-styled cause numbers are consolidated for all purposes. All pending motions, responses, and briefs in the consolidated cases are fully disposed of by this opinion.

[2] That motion and sixteen subsequent motions, along with numerous responses, many with rebuttals and a brief, were filed by either David Cox, pro se, his appointed counsel with the Mississippi Office of Capital Post-Conviction Counsel (CPCC), or the State.

[3] On August 15, 2012, Cox pled guilty to eight separate charges, including one count of capital murder. *Cox v. State*, 183 So. 3d 36, 42 (Miss. 2015). He was sentenced to death

remanded the matter to the Union County Circuit Court to determine if Cox was competent to waive his appeals and, if so, whether his waiver was voluntarily and intelligently made. The learned trial court held an evidentiary hearing and determined that Cox was competent to waive his appeals and that he voluntarily and intelligently did so. That decision was followed by CPCC's filing a notice of appeal of that order, which was assigned Cause No. 2021-CA-00515-SCT. The State then filed a motion to dismiss Cause No. 2021-CA-00515-SCT, arguing that CPCC lacked standing to appeal. Cox continued to plead that all appeals be dismissed, that his post-conviction counsel be relieved of their duties, and that his execution date be set. CPCC responded in opposition to the State's motion to dismiss, including filing a brief challenging the judgment of the trial court.

¶2. This Court has carefully examined all pleadings, filings, evidence, hearing transcripts, briefs, and exhibits and has considered the arguments and authorities cited by all in the two above-referenced cause numbers. This Court affirms the judgment of the trial court that Cox is competent to waive all of his appeals and that his waiver was voluntarily and intelligently made. This Court denies the appeal of that judgment filed by CPCC.

**PROCEDURAL HISTORY**

¶3. On October 24, 2016, the first of Cox's seventeen open motions was filed on his behalf. CPCC filed a Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief. Numerous motions for enlargement of time were filed and granted, and

---

on September 22, 2012. *Id.* He was also sentenced to an additional 185 years for the remaining seven charges. *Id.* On June 25, 2015, this Court affirmed Cox's convictions and sentences. *Id.* at 64.

this Court also granted CPCC leave to amend Cox's petition for post-conviction relief.

¶4.     In July 2018, Cox began communicating directly with the Court. In his first letter, Cox informed the Court that

> if I had my perfect way & will about it, Id ever so gladly dig my dead sarkastic wife up of in whom I very happiliy & premeditatedly slaughtered on 5-14-2010 & with eager pleasure kill the fat heathern hore agan . . . & would do it agan & agan, happilly if chance was given.[4]

In his second letter dated August 16, 2018, Cox requested, for the first time, to be allowed to waive all of his appeals and to be executed immediately. Cox stated that "I seek in earnest to wave all my appeals immediately, I seek to be executed as I do here this day stand on MS Death row a guilty man worthy of death. Please grant me this plea."

¶5.     On August 24, 2018, Cox filed a pro se motion with the Court, requesting that his appointed counsel be dismissed, all of his appeals be terminated, and his execution date be set immediately. Cox also stated:

> Moreover, I am Anabaptist, namely, old order Amish, & it is in conflict with my religeon to have lawyers. The First Amendment of the United State of America gives me the freedom of Religon & in Anabaptism we Anabaptist do NOT associate ourselves with any lawyers or state representatives. . . . I ask the court to evaluate the First Amendment & grant me my American rite as a American citizen to exrocise my Anabaptist faith in God with good conscious in the sight of Jesus Christ–my mediator.

¶6.     The Clerk of the Court provided the State and CPCC notice of Cox's letters and motions. The State promptly filed a motion to remand this matter to the Union County Circuit Court for a determination of whether Cox was willing and capable of waiving his appeals.

¶7.     Four days later, CPCC filed a motion to withdraw all of Cox's pro se motions and

---

[4] Language from Cox's letters and motions is quoted verbatim.

waivers, with an affidavit signed by Cox in support. Cox averred that he wanted to withdraw his communications and letters to the Court, he did not want to dismiss his attorneys, and he disavowed any waiver of his rights to continue his post-conviction case. He claimed that he was depressed and had not been on any antidepressant medication for several years. Cox also directed CPCC to oppose the State's motion to remand.

¶8. On November 5, 2018, Cox filed his pro se motion of retraction, asking to recall his affidavit and restore his previous motion to dismiss counsel and all appeals. He claimed that he was emotionally and psychologically intimidated and pressured to sign the August 29 affidavit, which he attached to his motion with the handwritten note "Dung & Void" printed at the top. In that motion, Cox stated that he was "of very sound mind and will" and was "totally guilty" of killing his wife. He pleaded to have his sentence of death, which he conceded was just and warranted, immediately carried out:

> I am worthy of death & I do not wish to challenge the State of Mississippi any further, I seek the termination of all counsel & all appeals on the grounds of ineffective and ineficent counsel.
>
> I seek the termination of all appeals wheather it be in the present or in the future. I seek to bring clousure to my victims & family & all I hurt whether it be emotionally, phsyikally or both, by the speedy execution of my guilty body.

He begged this Court to grant his motion so that he could give closure to his victims.

¶9. On that same day, the State filed its second motion for remand, which was opposed by CPCC. CPCC attached another affidavit from Cox, in which Cox stated that one part of himself sought "life and relief," while the other part sought "death and relief." On December 5, 2018, CPCC filed Cox's amended petition for post-conviction relief.

¶10. On December 13, this Court issued an En Banc Order granting the State's two motions for remand:

> The Court finds that the trial court should conduct a hearing in this matter and should determine whether Cox is competent and separately whether he knowingly and voluntarily is waiving his rights to all present and future appeals.

The Court stayed all matters before it pending that hearing.

¶11. Two weeks later, Cox filed a motion to amend his previous motion to terminate all counsel and all appeals filed on his behalf by his appointed counsel, stating that he is "in complete opposition to everything my state appointed counsel has ever filed on my behalf—still."

¶12. On January 2, 2019, Cox filed a motion for the rejection of all filings by CPCC. Cox averred that he "deliberately fabricated and deceitfully altered" his testimony during his assessments with experts selected by CPCC. Cox stated that he was promised pornographic magazines by a member of CPCC's staff if he would perform in an "unbecoming way" and in the interests of CPCC during the experts' assessment interviews. Cox also claimed that staff of CPCC approached him about signing a verification by oath, stating that all of his responses to the experts were true, but he refused.[5] Cox requested that all expert testimony in his current case be "expelled."

¶13. Cox next filed a motion for "appeals prevention 'after the fact' of competency

---

[5] His refusal to sign a verification by oath pursuant to Mississippi Code Section 99-39-9(3) (Rev. 2020) was noted by CPCC in its Amended Motion for Post-Conviction Relief or in the alternative for Leave to Proceed in Trial Court with a Petition for Post-Conviction Relief.

6

determined." Cox asked that, if he was found to be competent at his upcoming hearing, he would like to terminate all counsel immediately and represent himself pro se:

> Upon judgement of me being found competent I do not want my attorneys or any counsel to contest or challenge the Judges verdict on my behalf, but rather embrace the decision of my proceeding execution without hindrance. . . . Furthermore, I do NOT give my consent for counsel to file any appeals on my behalf—Ever. I do not want my state appointed counsel, or any counsel, in any way or form to oppose or suppress the effects or judgement of my rightly execution of in which, I, David Neal Cox, am worthy of, and have been found to be worthy of by a court of law in good standing with the state of Mississippi.

Cox attached a letter he sent to CPCC, forbidding them from hindering his execution in any way:

> I do NOT give counsel my consent to file any appeals on my behalf—Ever.
>
> Moreover, I seek to fire all counsel & waive all appeals & be immediately executed. I am guilty of all charges charged against me. I am willing to be executed immediately & I hereby notify all, I fire all counsel.

He also attached an affidavit dated September 18, 2019, in which he discussed a phone call with CPCC:

> In a legal phone call that I placed to my state appointed attorney in the month of September 2019, I asked my current counsel, agan still, to instruct me in legal process due me, to aid the furtherance of my legal constitutional right of my wish and desire still, to waive all my capital murder appeals, before "and" after Im found competent at my upcoming competentcy hearing to do so, & to be speedily executed immidately, & my own counsel refused to help me—still . . .
>
> As a matter of fact, my counsel's exact words to me were, "I can not in good conscience do that," thus violating my constitutional rights. . . .

¶14. On February 11, 2021, Union County Circuit Court Judge Kent Smith conducted a

competency hearing. Prior to any testimony being taken, both CPCC's and the State's experts were allowed an opportunity to examine Cox again.

¶15.    At that hearing in an opening statement, Humphreys McGee, an attorney employed by CPCC, discussed volunteerism and the two different schools of thought for defense attorneys. He stated that one camp was "client-centered" whiled the other was "cause-centered":

> The client-centered camp . . . does everything that one can to vindicate one's client's rights. The cause-centered camp treats that as a secondary matter and does everything one can to stop the death penalty from happening.

> Ms. Tyson and I fall squarely in the client-centered camp. We're here to help Mr. Cox  vindicate his rights. But we're also called here to help the Court find out whether or not . . . he's competent under **Rees v. Peyton**[6] to do what he says he wants to do.

> Cox also presented an opening statement to the court. He spoke of his religion, which

encourages nonresistance and discourages "self-preservation, lawyers, attorneys, or appeals." He admitted his guilt and asked to terminate all "present and future counsel, lawyers, attorneys, and appeals  subject to my religious beliefs in God as an Anabaptist. I am willing for immediate execution." Cox said that his court-appointed attorney would continue to appeal all rulings; "[t]herefore, I ask the Court today to legally block all sources, block all efforts and attempts, and block all appeals of further taking place after I'm found to be competent." Cox declared himself

> of sound mind and my reasoning as valid, willing, and guilty. In conclusion, I seek to be able to exercise my legal right as of the First Amendment. I seek to terminate all appeals and counsel, present and future. I am guilty of capital

---

[6] **Rees v. Peyton**, 384 U.S. 312, 312, 86 S. Ct. 1505, 1506, 16 L. Ed. 2d 583 (1966).

8

murder and do request that the Court hereby grant me a fast and speedy execution and give closure to my victims and their families immediately.

He also asked the court to excuse him from attending the hearing. The trial court appropriately denied Cox's request to be excused from the hearing, explaining to Cox that he was required to observe and interact with Cox in order to make an informed decision on Cox's competency.

¶16. After Cox completed reading the prepared statement, the trial judge asked Cox to state in his own words exactly what Cox was requesting from the judge. Cox stated that

> Since I come into God as an Anabaptist around the year 2014, the Lord has put guilt on me and remorse for my victims and families, and I believe that the victims and families and my children need to have closure.
>
> . . . As long as I'm alive and he has to go to the graveyard to see his daughter and I'm up walking around, watching TV with a remote control in my hands, it just ain't right.
>
> . . . It's not about me. It's about my family, it's about my children, it's about the -- Benny Kirk and his family. It's about them going to the graveyard to see their daughter and me laying up in the jail cell watching a brand-new TV with a remote control.
>
> . . . Scripturally, I expect God's will to be done through the judge, and he gave me death. This is what I want because of my belief in God. I desire this but, again, first and foremost, for my victims and children but, secondly, for me and my religion.

¶17. CPCC then called Ernest Dewayne Green, a childhood friend of Cox's, as its first witness, who testified that Cox sniffed gas at a young age. Sharlott Huston, Cox's sister, testified that Cox suffered from a head injury at approximately ten years of age when he fell off a seesaw and "cracked his skull" on the pavement below. Huston testified that she was unaware Cox abused pain killers after a back injury and then moved on to crystal meth until

after he was released from the Pontotoc jail. She testified that, during that same period, Cox told her that he was seeing demons. Huston also recalled Cox asking to borrow her vehicle the night he killed Kim. Huston stated that Cox's "eyes just went black" during their discussions.

¶18. After her testimony, Cox was allowed to respond. He informed the judge that Huston was describing the "anger for my wife [that] was building up and building up. It was anger." He testified that he was not on drugs the night of the murder, that he was not currently on drugs, that he was clear headed, and that he was not seeing any demons.

¶19. The next witness CPCC offered was Dr. Sarah Vinson, a board-certified adult, child, and forensic psychiatrist. She testified that she had been retained to evaluate Cox's competency to waive his appeals. Vinson had met with Cox at Parchman for a few hours. "We were able to hold a conversation about what was going on. His speech and his thought process were able to be followed throughout the conversation. There was some talk about really strong religious beliefs, but there wasn't anything that was overtly delusional." Cox was no longer on mood-stabilizing medications, only having taken them the first three months he was incarcerated. Vinson did not diagnose Cox with any mental illness. When asked whether Cox suffered from a "mental disorder or defect that may substantially affect his ability to make a rational decision in this case," Vinson testified that Cox did not necessarily have "a mental disorder or a defect that prevents him from making a rational decision in this case."

¶20. Vinson admitted on cross-examination that Cox had the ability to make a logical

10

choice. Vinson also testified that she did not believe that any defect Cox might have was preventing him from understanding his legal position and available options or from making a decision based on those options.

¶21. The trial court also questioned Vinson. Vinson confirmed that Cox was aware of (1) his circumstances, (2) the consequences of making a decision to forego his appeals and other litigation, and (3) the fact that if he was found to be competent then he would be executed.

¶22. After Vinson's testimony, CPCC rested. The trial judge then questioned Cox's Mississippi Department of Corrections transport team. All four testified that Cox understood his surroundings and why he was in court. They all also testified that Cox complied with all of their instructions.

¶23. The State called one witness Dr. Amanda Gugliano, a forensic psychologist with the Mississippi State Hospital. Dr. Gugliano was on the team that determined Cox was competent to stand trial in 2012. Gugliano interviewed Cox again in August 2019 to determine if he was competent to waive his appeals. Gugliano testified that Cox was very cooperative during the interview—logical, organized, and goal-directed. He exhibited no symptoms of any psychosis. Gugliano testified that Cox had a clear understanding of his current legal proceedings.

> [Cox] stated, "My understanding is I am guilty of all the charges. I went to court on 9/17/2012 through 9/22/2012. I received the death penalty. I understand that I will be killed dead by lethal injection for my crime that I did commit. I'm in full agreement with the judge. I think the judge exercised proper authority and proper procedures."

Cox informed Gugliano that he wanted to waive his appeals because he was guilty of the

crime. Cox wanted to provide closure to his wife's family and children. Cox desired no further litigation, which he said would be in opposition to his religious beliefs. Gugliano opined that no mental disease, disorder, or defect "would prevent him from understanding his legal position and available options" or "would prevent him from making a rational choice." Gugliano also testified that Cox had "the mental capacity to appreciate his position and make a rational choice with respect to continuing or abandoning litigation in his death penalty case."

¶24. The trial judge also questioned Gugliano. Gugliano testified that Cox did not exhibit any symptoms of a mental-health deficit when he read his statements earlier that morning.

> Q. Now, you testified to a reasonable degree of certainty within the field of forensic psychology as to the questions posed to you regarding the *Rees* standard. I don't think that Counsel asked you the questions regarding the *Rumbaugh*[7] standard, and I wanted to know to a reasonable degree of professional certainty do you believe that Mr. Cox suffers from a mental disease or defect that would prevent him from understanding the nature of his circumstances and options available to him?
>
> A. No.
>
> Q. To a reasonable degree of certainty, do you have an opinion as to whether he suffers from a mental condition that would prevent him from making a rational or logical choice from the options that are available to him?
>
> A. I do not believe that he's prevented from doing so.
>
> BY THE COURT: With that having been said, Mr. McGee, do you have any follow up?
>
> BY MR. McGEE: Your Honor, has Your Honor asked the same question pursuant to the *Rees* standard?

---

[7] *Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985).

12

BY THE COURT: Counsel did.

BY MR. McGEE: Okay.

BY THE COURT: Counsel tracked all of the *Rees* factors because at break I'd written them down, and I checked them off just not to be redundant. To a reasonable degree of medical certainty, she testified, the doctor did, that he was capable of making a knowing, rational choice with respect to continuing or abandoning future litigation and appeals. And then she also gave an opinion that he was not suffering from a defect -- she said she -- he was suffering from a defect but she didn't believe that it would substantially affect his capacity to make such decisions, and at that time, she said, well, may or may not, and they discussed the may issue.

¶25. The State rested. Cox was allowed to make a final statement to the court. He asked that Vinson's testimony be struck because she provided no diagnosis of her own. He also asked that any expert's testimony given in support of his post-conviction-relief claim be struck because the reports were not prepared in response to the competency hearing.[8] Cox concluded his remarks with the following:

I am fully competent, Your Honor. You'll listen to your lawyers, my attorney -- my attorney -- he wants a win. A win. He wants a win. I seek the relief of my victims' families, of my children so they can sleep a peaceful night, I seek the relief of Benny Kirk and his family when they go to the gravesite to see their daughter and me up there in a cell watching color TV with a brand-new remote control and a brand-new TV, eating good canteen food, making $125 worth of canteen every week. Every week. I seek their relief, but my lawyer seeks a win.

¶26. CPCC waived closing arguments. The State argued that under either the *Rees* or *Rumbaugh* standard or both standards there was no question that Cox was competent to waive his appeals. CPCC's own expert did not dispute that Cox was competent.

---

[8] The trial court informed Cox that the reports of the experts that did not evaluate him for competency would not be considered.

13

¶27. The trial court made a ruling from the bench. It dismissed as moot the motions to withdraw pro se filings and waivers. It found that the dismissal of counsel was not before it and informed Cox to address that issue to this Court. As to competency, the trial court held:

> Frankly, sir, it's the opinion of this Court that it is time for the imposed sentence to be undertaken. It is time for the execution to be scheduled. I base that opinion on several matters that I want to take time to enumerate in my record.
>
> In reviewing this matter, clearly, I looked at the precedent outlined in *Rees v. Peyton*, the United States Supreme Court that both counsel cited.
>
> I also reviewed the *Rumbaugh* standard that followed that opinion by 19 years. I don't believe that they are in conflict. I believe that, actually, they're trying to answer the same question and arrive at the answer "Is the petitioner" -- in this case Mr. David Cox -- "is he competent to make a decision to waive all of his appeals and future litigation? Does he do so voluntarily? Does he do so knowingly?"
>
> In those particular cases, both experts did testify regarding these issues. I believe that I must make a judicial determination as to his competency, so I ask the question: Is he capable of appreciating his position, his circumstances?
>
> Well, I must say that I have closely studied his demeanor, his actions, his reactions. I have listened to him address the Court on several different occasions. He is very concise in what he has said. He's very consistent in the request that he's made. He doesn't waiver when he's questioned about matters relating to his case.
>
> I would have to say that his statement to the Court, his responses to questions that have been asked of him during this hearing, have been consistent and they show the Court that he is capable and competent to respond and to make decisions.
>
> I listened to the testimony of the experts and their comments about competency being a present mental state. I think that he has to be judged as to his present mental state, and therefore I think it's incumbent upon me in

14

reading the **Wilcher** [9] decision and looking at the instruction provided by Judge Wingate to evaluate Mr. Cox, to interact with him to see how he responds.

It is my opinion that he understands the gravity of his circumstance, the seriousness of the consequences that he faces, and the decisions that accompany his circumstance. He is aware of the consequences of making those decisions. Frankly, he has stated all of his reasoning, including his religious beliefs.

. . . Dr. Gugliano stated that she did not believe that he had such a mental defect that would affect him. . . . Dr. Gugliano has seen this man for over a 10-year period. She's met with him over five times. She's provided psychological testing. She offered all of her opinions to a reasonable degree of certainty in her field of expertise, being forensic psychology.

. . . Dr. Vinson, who is very well qualified and credentialed, continuously said there was a "possibility." She said "it can be," "it could be," "it may be." And she hung her head on that.

That's why I asked questions of both experts, to incorporate not only the **Rees** standard but the test of the **Rumbaugh** court. And that's -- did they have a mental defect that would prevent them from understanding the nature of the circumstances and options available, and both answered that the same way.

And then both, when asked if Mr. Cox had a mental condition that would prevent him from making a rational choice from the options available to him, both said no, they did not.

. . . .

So, clearly, in looking at this matter under **Rees**, **Rumbaugh**, and the guidance of **Wilcher**, I do find that Mr. Cox is competent and capable to appreciate his position and circumstances in this case. I find that he is capable of making a knowing, rational decision in choice [sic] with respect to abandoning any further litigation and appeals.

I further find that if he is suffering from any mental disorder or defect, it is not one that would rise to the level of substantially affecting his mental

---

[9] **Wilcher v. Epps**, No. 3:98-CV-236-WS, 2006 WL 1766718, at *1 (S.D. Miss. June 23, 2006).

capacity of making decisions relating to proceedings in continuing appeals or further litigation.

Also, any mental defect or condition that he suffers from would not prevent him from making a rational choice, an intelligent, knowing, and logical choice, from the options available to him. This man has consistently said that he's guilty of this situation, he accepts the finding of the jury, he accepts the sentence of the judge. He is sentenced to death. He is housed on death row with the Mississippi Department of Corrections.

The fact that he has gone through the appellate process, the fact that he has been incarcerated for some 10 years now leaves this Court to believe that his decision to give closure to himself as well as the victims is very rational. You know, I question the fact that -- with people wanting to continue or delay the inevitable. And his approach to this is not two weeks or two months or two years after conviction. He has gone through the process, he has gone through his appeal, he has been on death row, and he has made a decision that I find to be competent and knowing, willful and voluntarily to proceed with his execution.

And I asked Dr. Vinson -- although it's not a straight standard from the three cases that we continued to cite, but it is instructive and intuitive to me, I asked her during her conversations did she find Mr. Cox to be aware of his circumstances? Yes.

Aware of the consequences of making a decision to forego his appeals and other litigation? Yes.

Aware of the fact that if he is found to be competent that he will be scheduled for execution? Yes.

I even asked the transport team to comment on their observations of Mr. Cox during the quiet times if you will. We all see people in open court, but I know from having practiced law for about 30 years, I know that you have intimate times to interact with people. And I know that when I read the Wingate opinion that was contained within the *Wilcher* case, I know that there are things that are instructive to me. And it talks about Judge Wingate carefully studying the volunteer and going through that.

. . . .

And I satisfied myself through my interactions and questioning of you,

16

my observations of you, that you do clearly understand what you're asking the Court to do, you're very intent and unwavering in your request to ask the Court to find you competent just so you can proceed with your execution.

. . . .

My findings on those is that you are, sir, competent and that you are capable of making such decisions, because I do not find that you suffer from such defects, disease, or deficit that would or could or may substantially affect your ability to make those decisions.

¶28. Two weeks after the trial court found Cox competent, Cox filed a motion with this Court to terminate all appeals, to dismiss all counsel, and to proceed with his execution. Both the State and CPCC responded. In CPCC's response, CPCC argued that Cox's desire to waive his right to pursue post-conviction relief made him a "death-row volunteer." CPCC argued that this was a case of first impression and requested that Cox's counsel not be dismissed. CPCC argued that counsel was needed to ensure the proper presentation of material issues on appeal and to competently brief and argue these issues of first impression before this Court.

¶29. Approximately one month later, CPCC filed its notice of appeal from the trial court's ruling that Cox was competent to waive present and future appeals. The State moved to dismiss CPCC's notice of appeal because Cox had been deemed competent to waive his appeals. The State argued that Cox's appointed counsel lacked standing to file and pursue an appeal against their client's wishes. The State averred that there was no reason to keep delaying justice when Cox had been urging this Court for three years to terminate his appeals and counsel and to proceed to execution. In its responses, including a brief, CPCC argues against the overwhelming body of law from the United States Supreme Court, the United

States Court of Appeal for the Fifth Circuit, six other United States courts of appeal, and numerous state courts that have held if an inmate is found competent to waive his appeals and counsel, family members and attorneys lack standing to appeal such a finding of competence.

¶30. Cox filed another pro se motion on July 23, 2021, for "complete termination and dismissal of all present and future counsel and attorneys and proceeding forth 100% pro se unto speedy and immediate execution without delay-immediately." Cox requested that this Court allow him to terminate all counsel. In response, CPCC urged the Court to allow the State and CPCC to argue the merits of the underlying ruling of competency by the trial court.

¶31. On August 18, 2021, Cox filed a motion to prohibit the CPCC from filing any additional motions, appeals, and other filings on his behalf. This Court ordered both CPCC and the State to respond to Cox's motion. In its response, CPCC adopted its previous arguments. The State argued that Cox's motion should be granted because the trial court had found him competent to dismiss his appeals.

¶32. On September 9, 2021, Cox filed another motion to dismiss all appeals and all counsel. CPCC and the State responded with arguments consistent with previous pleadings.

**ANALYSIS**

¶33. In cases of questions of competency, this Court reviews the trial court's decision for abuse of discretion. *Martin v. State*, 871 So. 2d 693, 698 (Miss. 2004). "We will reverse a trial court's competency determination only if it is 'manifestly against the overwhelming weight of the evidence.'" *Dickerson v. State*, 175 So. 3d 8, 15 (Miss. 2015) (quoting *Hearn*

18

***v. State***, 3 So. 3d 722, 728 (Miss. 2008)). While this Court is aware of the heightened standard associated with all death-penalty cases, that heightened standard is in place to ensure that an innocent person is not executed. In motions Cox has filed, he has attested to his guilt and sincere remorse for the misery visited upon the surviving family members, while at the same time exhibiting no remorse for the act of murdering his wife.

¶34. The trial court has found Cox to be competent to waive his appeals. Cox continues to implore this Court to terminate all appeals and to terminate counsel, as they continue to file motion after motion, appeal after appeal, against his wishes. Cox exhibited to the trial court a clear understanding of the finality that will come about as a result of his request. Cox prays that his death sentence be imposed.

¶35. Cox's testimony in the trial court and pleadings before this Court stand in stark contrast to CPCC's efforts to deny Cox's obtaining final judgment and self-representation. CPCC argues that this is a case of first impression in this Court. However, the United States Supreme Court, the United States Court of Appeals for the Fifth Circuit, and the United States District Court for the Southern District of Mississippi have all addressed this issue. Those courts unanimously agree that a defendant may elect to conduct his own defense, as long as that decision is voluntarily and intelligently made. This Court adopts their same sound reasoning.

¶36. In ***Rees***, one month after a petition for certiorari review was filed in the United States Supreme Court, Rees "directed his counsel to withdraw the petition and forgo any further legal proceedings. 384 U.S. at 313. Rees previously had been convicted of murder and was

sentenced to death by a state court in Virginia. *Id.* The Supreme Court remanded the matter to the federal district court with instructions to make a "determination as to Rees'[s] mental competence and render a report on the matter to us." *Id.* at 314. This case produced the first standard in determining a defendant's competency in forgoing legal proceedings in a death case. That standard is:

> whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Id.*[10]

¶37.    The trial court in today's case followed the *Rees* standard, specifically questioning the two experts as to whether Cox understood his position and could make a rational choice regarding abandoning all present and future appeals. It also inquired as to whether Cox suffered from a mental deficit that "may substantially" affect his capacity to make such a decision. The trial court was satisfied that the *Rees* standard had been met and that Cox was in fact competent to waive present and future appeals.

¶38.    In all of his pro se motions before this Court and throughout his remand competency hearing, Cox explicitly declared his guilt for killing his wife. He accepted his punishment of death and awaits the imposition of his sentence. The record before this Court resoundingly evinces Cox's waiver was made intelligently and understandingly, knowing full well the end

---

[10] In an effort to determine the outcome of any subsequent hearings, it was determined that the petition for writ of certiorari to the United States Court of Appeals for the Fourth Circuit was dismissed on October 2, 1995. *Rees v. Superintendent of Va. State Penitentiary*, 516 U.S. 802, 116 S. Ct. 271, 133 L. Ed. 2d 10 (1995).

result would be sure and certain death.

¶39.    In *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 2527, 45 L. Ed. 2d 562

(1975), the United States Supreme Court addressed the issue of counsel:

> whether a defendant in a state criminal trial has a constitutional right to
> proceed without counsel when he voluntarily and intelligently elects to do so.
> Stated another way, the question is whether a State may constitutionally hale
> a person into its criminal courts and there force a lawyer upon him, even when
> he insists that he wants to conduct his own defense.

The Supreme Court held that a State could not force counsel on a defendant who voluntarily

and intelligently elects to proceed pro se. *Id.* In today's case, CPCC, not the State, is

attempting to override Cox's constitutional right of self-representation in favor of a "cause-

centered" plea. *Supra* ¶ 15.  The Supreme Court's authoritative pronouncement forecloses

CPCC's attempt to compel its own presence into these proceedings when Cox clearly does

not desire any appeals be made on his behalf.

¶40.    In *Faretta*, the trial court found that Faretta had no constitutional right to represent

himself. 422 U.S. at 810. The United States Supreme Court reversed, based on long-standing

principles and constitutional implications and held:

> In the federal courts, the right of self-representation has been protected
> by statute since the beginnings of our Nation. Section 35 of the Judiciary Act
> of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President
> Washington one day before the Sixth Amendment was proposed, provided that
> "in all the courts of the United States, the parties may plead and manage their
> own causes personally or by the assistance of such counsel . . . ." The right is
> currently codified in 28 U.S.C. § 1654.

> With few exceptions, each of the several States also accords a defendant
> the right to represent himself in any criminal case. The constitutions of 36

States explicitly confer that right.[11] Moreover, many state courts have expressed the view that the right is also supported by the Constitution of the United States.

*Id.* at 812-14. Previously, the Supreme Court held that

> The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. The public conscience must be satisfied that fairness dominates the administration of justice. . . . But the Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open.
>
> . . . .
>
> What were contrived as protections for the accused should not be turned into fetters. To assert as an absolute that a layman, no matter how wise or experienced he may be, is incompetent to choose between judge and jury as the tribunal for determining his guilt or innocence, simply because a lawyer has not advised him on the choice, is to dogmatize beyond the bounds of learning or experience.
>
> . . . .
>
> When the administration of the criminal law in the federal courts is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . and to base such denial on an arbitrary rule that a man cannot choose to conduct his defense before a judge rather than a jury unless, against his will, he has a lawyer to advise him, although he reasonably deems himself the best advisor for his own needs, is to imprison a man in his privileges and call it the Constitution.

*Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 241, 87 L. Ed. 268 (1942) (citing *Johnson v. Zerbst*, 304 U.S. 458, 468, 469, 58 S. Ct. 1019, 1024, 1025, 82 L. Ed. 1461 (1938)). The *Adams* Court held that "an accused, in the exercise of a *free and*

---

[11] Our state constitution provides the accused the right to defend himself either by himself, by counsel, or both. Miss. Const. art. 3, § 26.

*intelligent choice*, and with the considered approval of the court, may waive trial by jury, and so likewise may he *competently and intelligently waive his Constitutional right to assistance of counsel.*" *Id.* at 275 (emphasis added).

¶41. Moreover, the United States courts of appeal have repeatedly held that the right of self-representation is protected by the Bill of Rights. For example, the United States Court of Appeals for the Second Circuit held that the right to assistance of counsel was intended to supplement the other rights of the defendant and not to impair "the absolute and primary right to conduct one's own defense in propria persona." *United States v. Plattner*, 330 F.2d 271, 274 (2d Cir. 1964). There is a universal conviction on the part of our courts "that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta*, 422 U.S. at 817. While a defendant may be better served by guidance from counsel, a defendant may voluntarily reject such assistance.

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

*Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51, 90 S. Ct. 1057, 1064, 25 L. Ed. 2d 353 (1970) (Brennan, J., concurring)). However, the Supreme Court held that to relinquish the right to counsel, it must be determined that the defendant did so knowingly and intelligently. *Id.* at 835. Additionally, forcing a defendant to accept state-appointed counsel, after his knowing and intelligent waiver, would "deprive[] him of his constitutional right to conduct his own defense." *Id.* at 836.

23

¶42.    Cox's case is no different. CPCC cannot force its "cause-centered" pleas upon Cox, who has knowingly and intelligently waived all present and future litigation. The trial court found that Cox voluntarily exercised his right to abandon all present and future appeals. CPCC may not impose its opposition to the death penalty to supersede a constitutional right granted by the Mississippi Constitution, which has existed since 1817, or a federal right, which preceded the United States Constitution, since 1789.

¶43.    The United States Court of Appeals for the Fifth Circuit, in ***Rumbaugh v. Procunier***, 753 F.2d 395 (5th Cir. 1985), held accordingly. Rumbaugh was convicted of capital murder and sentenced to death by a Texas court. ***Rumbaugh***, 753 F.2d at 396. After his conviction and sentence were affirmed, Rumbaugh

> asked his court-appointed counsel to take no further steps to attack his conviction and sentence. When counsel ignored this request and moved for a rehearing, Rumbaugh wrote the Clerk of Court for the Texas Court of Criminal Appeals and requested that all motions filed by his counsel be withdrawn and that a mandate of affirmance issue forthwith. The court obliged and the mandate issued. Rumbaugh then wrote the state trial judge requesting that his execution be set without further delay. Rumbaugh's execution was set for July 23, 1982. Rumbaugh refused to authorize anyone to file a petition for writ of certiorari or to seek a stay of execution.

*Id.* at 396-97.  Rumbaugh's parents, as next friends, filed an application for state habeas relief. *Id.* at 397. That relief was denied. *Id.* The state court also denied the parents' motion for a stay of execution and application for habeas relief. *Id.* The district court granted the motion for stay, appointed counsel to represent Rumbaugh, and after a hearing, ordered that Rumbaugh be examined to determine his mental competence to waive review of his conviction and sentence. *Id.*

24

¶44. On appeal, the Fifth Circuit recited the **Rees** standard employed for determining "whether a person is mentally competent to choose to forgo further appeals and collateral attack upon his conviction . . . ." *Rumbaugh* 753 F.2d at 398. The Fifth Circuit held that the test required three questions be answered:

(1)    Is the person suffering from a mental disease or defect?

(2)    If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3)    If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent. We find no reported case applying the Rees standard to a defendant's decision to forgo further appeals and collateral proceedings which decides how a court should treat a mental disease which does not impair the cognitive function but impacts only on the volitional, the person's ability to make a rational choice among available options.

*Id.* at 398-99.

¶45. In addressing that issue, a three-judge panel made "an exhaustive review of this record, including a review of the tortuous and bizarre course this litigation has followed," and held that "the district court was correct in finding and concluding that Charles Rumbaugh possesses the requisite mental competence to decline to exercise his rights to secure collateral review of his conviction and sentence." *Id.* at 396. The Fifth Circuit found that Rumbaugh

25

was "able to feed relevant facts into a rational decision-making process and come to a reasoned decision"; that Rumbaugh was aware that there was "no hope of successful treatment which would reduce his [severe depression] to a tolerable level or enable him to exist . . . if his appeals were successful"; and that his "assessment of his legal and medical situations, and the options available to him, are reasonable . . . ." *Id.* at 402.

> Rumbaugh's written answers to the questions and his statements to the doctors and to the court clearly reflect his awareness of his legal situation and of his right to file state and federal habeas petitions. His answers to the questions list several arguably sound grounds for attack which could not be summarily rejected. Rumbaugh indicates adequate awareness of this reality. He understands his situation and his options. His ability to make the life/death choice is apparent from his comments to Dr. Logan that if he thought that meaningful treatment were available and if it were offered, he would probably change his decision not to appeal. We find that decision to be the product of a reasonable assessment of the legal and medical facts and a reasoned thought process, albeit one that we would disagree with.

> Our conclusion that the evidence supports the district court's finding of competency is reinforced by Rumbaugh's actions after the district court's decision and while the appeal was under advisement. He filed an extremely coherent and well-reasoned pro se state habeas corpus petition. That petition states substantial grounds for attacking his conviction and sentence. When it became apparent that this appeal would not be dismissed because of the state petition, he withdrew his pro se petition, stating in his motion to dismiss that he believed the grounds substantial and well-founded but that he was making the choice not to appeal.

> Rumbaugh has striven mightily to prove his mental competence to make his legal decisions. He convinced the district court who presided over the dramatic hearings. We cannot tag that finding as clearly erroneous. Nor can we conclude as a matter of law that a person who finds his life situation intolerable and who welcomes an end to the life experience is necessarily legally incompetent to forgo further legal proceedings which might extend that experience.

*Id.* at 402-03.

26

¶46. Today's trial court asked the same three questions of the witnesses presented. Likewise, it found that if Cox was suffering from a mental defect, that defect did not prevent him from understanding his legal position and all available options. Nor did the defect prevent him from making a rational choice among his available options. Cox was found to understand his situation and his option for further appeals. His rational decision-making process in forgoing those appeals included his admission of guilt, his religious beliefs, and his desire to give peace to his children and their mother's family. The trial court found, and this Court agrees, that his decision was the product of a reasonable assessment of all available options. We cannot find that the trial court erred in finding Cox to be competent.

¶47. Cox's mental capacity is no longer an issue to be determined. The trial court found him to be competent and to have knowingly and voluntarily relinquished all present and future appeals. Cox has shown that he understands the significance of his abandonment of all appeals and continues to urge this Court to immediately set his execution date.

¶48. Cox is not the first Mississippi death-row inmate to volunteer for execution. In 1982, Bobby Wilcher was convicted of two counts of capital murder and received two death sentences. *Wilcher v. Epps*, No. 3:98-CV-236WS, 2006 WL 1674300, at *1 (S.D. Miss. June 14, 2006). This Court first affirmed Wilcher's convictions and sentences in 1984. *Id.* Subsequently, Wilcher filed numerous motions, appeals, and petitions in both state and federal courts. During those numerous appeals, Wilcher filed application for a stay of execution in the United States District Court for the Southern District of Mississippi, which was granted on April 2, 1998.

27

¶49.    While his stay of execution remained in place, Wilcher continued to file motions,

petitions, and appeals to state and federal courts. In 2001, the district court administratively

closed Wilcher's case until all state proceedings were completed. After his final petition for

post-conviction relief was denied by this Court, Wilcher filed a petition for writ of habeas

corpus in the district court. *Id.* at *2.  Approximately one year later, Wilcher filed a motion

to dismiss all remaining appeals. *Id.* At a hearing on the motion, in which Wilcher was

present, he testified that

> he wished to dismiss the habeas petition pending before this Court and to have
> the State of Mississippi proceed with his execution, no matter what his
> attorneys thought he should do. Petitioner's counsel then raised a question
> regarding petitioner's competency to waive further litigation of his case. . . .
>
> The Court then extensively questioned petitioner regarding his motion. After
> examining petitioner and discussing with him the import of what he was
> requesting, the Court finds that petitioner is competent to waive his appeals.
>
> The Court finds that petitioner has the capacity to appreciate his position in
> this case. The Court finds that petitioner is capable of making a rational choice
> with respect to continuing or abandoning further litigation of this case. Further,
> the Court finds that petitioner is not suffering from a mental disease, disorder,
> or defect which may substantially affect his capacity to make the decision to
> waive further litigation of this case. After considering the arguments of
> counsel and the extensive discussion with the petitioner, the Court finds that
> petitioner is competent under the standard set forth in ***Rees v. Peyton***, *supra*.
>
> Having found that petitioner is competent to make the decision whether or not
> to continue further litigation of his case, the Court finds that petitioner's
> motion to dismiss his habeas petition should be granted.

*Id.* at *2-3. The district court also dismissed the pending petition for writ of habeas corpus

with prejudice and vacated the stay of execution previously entered. *Id.* at *3.

¶50.    Subsequently, appointed counsel for Wilcher filed a motion to reinstate the stay of

28

execution. ***Wilcher v. Epps***, 2006 WL 1766718, at *1. Defendant Wilcher did not authorize

such motion to be filed, as he had previously stated in open court that he wanted to dismiss

a pending petition for habeas corpus and proceed immediately with his execution. ***Id.*** at *1.

That motion was filed in direct opposition to Wilcher's request. ***Id.*** The State responded,

objecting to the motion on the following grounds:

> that Wilcher has clearly declared that he wishes to abandon all appeals which
> would frustrate or delay the State of Mississippi from conducting his
> execution; that Wilcher was mentally competent to make this decision; that
> Attorney Johnson's absence from the June 8, 2006, hearing had no bearing on
> the proceedings; and that Attorney Johnson has no standing as a "next friend"
> to request a stay of execution, which request is at odds with the desires of
> Bobby Wilcher.

***Id.***

¶51.    The district court reiterated the ***Rees*** standard recognizing that "the petitioner will be

found competent unless he lacks sufficient capacity to appreciate his position and make a

rational choice with respect to continuing or abandoning further litigation." ***Id.*** at *2 (citing

***Rees***, 384 U.S. at 312). In recapping the hearing held two weeks earlier, the district court

stated as follows:

> The court closely studied Wilcher's demeanor, actions and reactions and
> listened attentively to whether his statements betrayed any nuances, hesitations
> or reluctance at odds with his declarations. The court heard nothing such.
>
> The court subjected Wilcher to a number of questions designed to inform this
> court whether Wilcher understood the grave consequences of his decision and
> whether Wilcher was suffering any mental defect. Wilcher responded as
> follows. Wilcher stated that he was ready to die. He understood that
> abandoning these appeals could lead to immediate execution. He understood
> that execution would be by lethal injection. He stated that he had no real
> confidence in his appeals and characterized the appeals as "begging" appeals,
> a term, he says, used on death row to describe an appeal without any true

29

substance, but which simply hopes to delay the execution. Wilcher emphatically stated that he should be the one to determine his fate, that it was his life and that he should be the ultimate decision-maker. He denied that he was suffering from any mental problems or defects. He informed the court that he was aware that his attorneys would try to frustrate his request for execution. He said he had allowed them to make their arguments against his wish for death, but he had rejected their arguments and, quite frankly, did not need to speak with them again. *When Attorney Royals asked if he and the other attorneys could be excused from further representation, Wilcher, somewhat amused, said no. He explained. Wilcher said that he did not want to excuse his attorneys because he did not believe he could be put to death without having an attorney. If the present group of attorneys were excused, said Wilcher, the State may have to appoint new attorneys who would seek a delay in the execution to become familiar with the case. Wilcher said he wanted no further delays and therefore did not want to excuse his present attorneys, although he was not interested in any further dialogue on his announced intention to die.* When the court asked Attorney White to provide a time frame for the execution and when Attorney White stated that he would seek an execution date within the next thirty days, Wilcher was pleased and said "there you go!"

. . . .

Having already considered the psychological evidence and testimony presented both for and against Wilcher in prior proceedings, and proceeding in accordance with **Rees**, this court extensively questioned Wilcher regarding his motion to forego all further appeals. After examining Wilcher and discussing with him the import of what he was requesting, this court made a judicial determination that he was competent to waive his appeals, that Wilcher possessed the capacity to appreciate his position in this case, and that he was capable of making a rational choice with respect to continuing or abandoning further litigation of this case. Finally, this court found from its inquiry that Wilcher was not suffering from a mental disease, disorder, or defect which might affect substantially his capacity to make the decision to waive further litigation of this case. So, after considering the arguments of counsel and the extensive discussion with Wilcher, this court concluded that Wilcher was competent under the standard set forth in **Rees**.

*Id.* at *2-3 (emphasis added). The district court recognized Wilcher's desire to dismiss all appeals and Wilcher's understanding of the dire consequence. *Id.* at *5. The district court denied the motion to reinstate the stay of execution, holding that Wilcher

30

has reminded his attorneys that he, not they, should be the ultimate decision-maker as to these matters and that while he understands their zeal to continue to fight, he is committed to a decision that he has reached after much reflection. This court agrees with Wilcher that this call is his to make.

*Id.*

¶52. Immediately after then-Chief Judge Wingate issued his rulings granting Wilcher's motion to dismiss all appeals, vacating the stay, and denying appointed counsel's motion to reinstate the stay, appointed counsel filed another motion to set aside the two previous orders, to reinstate the stay of execution, and for appropriate mental evaluation. *Wilcher v. Epps*, No. 3:98-CV-00236WS, 2006 WL 1851270, at *1 (S.D. Miss. June 30, 2006). Wilcher filed a motion urging the district court to not accept any motions filed by his appointed counsel. *Id.* at *2. Wilcher stated that he understood his appointed attorneys would be filing a "volley of motions" seeking to stop his execution. *Id.* However, Wilcher again asked the district court to deny any such motion and let his execution stand. *Id.*

¶53. The district court denied the motion, holding that it had

> concluded from its observation and inquiry, and from the many mental examinations of Wilcher conducted in the past and presented as exhibits to this court, that Wilcher is not now suffering from a mental disease, disorder, or defect which might affect substantially his capacity to make the decision that he has to waive further litigation of this case. Once the court makes this determination, counsel has no standing to proceed on Wilcher's behalf in this matter and pursue further hearings and investigations in contravention of Wilcher's decision.

*Id.* at *1.

¶54. Against Wilcher's wishes, counsel sought application for a certificate of appealability to appeal the district court's rulings. *Wilcher v. Anderson*, 188 F. App'x 279, 280 (5th Cir.

31

2006). The Fifth Circuit denied application finding that after

> [h]aving carefully reviewed counsel's application and supporting documents, the State's response, the transcript of the hearing in the district court, and the district court's Order, we conclude that the district court committed no error, and that reasonable jurists would not disagree with the propriety of that court's Order. . . .

> The long-established legal standard concerning the competency of a death row inmate to abandon further appeals of his sentence is "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." [*Rees*, 384 U.S. at 314] We have held that "a habeas court must conduct an inquiry into the defendant's mental capacity . . . if the evidence raises a bona fide doubt as to his competency," noting that "the extent and severity of the petitioner's history of mental health problems which have been brought to the court's attention influence the breadth and depth of the competency inquiry required." [*Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000).]

> The district court entered its finding of Wilcher's mental competency under the *Rees* standard after extensively questioning him in person in open court, observing his demeanor, and reviewing past mental examinations. We are satisfied that the inquiry conducted by the district court was constitutionally sufficient, as the evidence presented to the court did not raise a bona fide doubt as to Wilcher's competency. [*See id.* at 329-30] There was not, for example, evidence of a long history of uncontrolled mental health problems, and Wilcher was physically present at the hearing and was personally examined in depth by the district court.

> That able and persuasive Counsel was finally successful in convincing Wilcher to do an about-face scant days before his requested execution is not surprising-but is without authority under applicable law and is to no avail.

*Wilcher*, 188 F. App'x at 281.[12] Counsel filed a petition for writ of certiorari to the United

States Supreme Court, which was denied. *Wilcher v. Epps*, 549 U.S. 898, 127 S. Ct. 214, 166

---

[12] At some point during the pendency of his appeal, Wilcher filed an affidavit seeking to reinstate his habeas petition.

L. Ed. 2d 172 (2006).

¶55.    On October 5, 2006, less than two weeks before Wilcher's scheduled execution, Wilcher, through his attorneys, filed an "Emergency Motion To Reinstate Petition For Writ Of Habeas Corpus, To Withdraw Petitione"s Pro Se Motion, And To Reinstate Stay Of Execution." *Wilcher v. Epps*, 239 F.R.D. 463, 464 (S.D. Miss. 2006), *aff'd*, 203 F. App'x 559 (5th Cir. 2006). The district court heard argument from counsel and one witness, the in-house attorney from the Mississippi Department of Corrections, called by the State. *Id.* Although Wilcher did not address the court, he earlier stated that

> he wanted some distance between him and his attorneys because he did not want them trying to talk him out of his decision to abandon. Showing a mature understanding of the appellate process, Wilcher stated to the court that he did not want them excused from further representing him because the State would not allow him to die without any representation, that the court would later have to appoint new attorneys, who then would ask that the execution be postponed so that new counsel could become familiar with the record.

*Id.* at 465.  Wilcher only offered that he was "in the grip of hopelessness, frustration and at a low point in his life. He offer[ed] nothing else." *Id.* Wilcher's counsel argued that Wilcher made a drastic decision and that, because of the finality of his punishment, Rule 60(b)(6) of the Federal Rules of Civil Procedure compelled the court to grant his relief. *Id.* at 465-66. The State countered that Wilcher's request was tantamount to a successive petition for writ of habeas corpus and that he was attempting to use Rule 60(b)(6) to submit claims that would otherwise not be permitted. *Id.* at 466. Alternatively, the State argued that Rule 60(b)(6) was not applicable because Wilcher failed to present any extraordinary circumstances and was seeking relief from his own voluntary actions. *Id.*

33

¶56.  The district court considered all arguments, as well as

> the integrity and wholesomeness of the criminal justice procedural system; that Wilcher's guilt is firmly established by the evidence; that this court adjudicated Wilcher mentally competent when he made his abandonment request; that he submits not a valid medical or psychological or coercive excuse, but simply a statement that he felt hopelessness, frustration and was at a low point in his life.

*Id.* The district court also noted that both the Fifth Circuit and United States Supreme Court had considered Wilcher's July 7, 2006 affidavit, indicating he had changed his mind. *Id.* "Those courts seemingly were unimpressed with the statement." *Id.*

¶57.  The district court denied Wilcher's motion, concluding that Wilcher had abandoned his appeals "freely, without reservation and with a clear, full understanding of the expected and desired result."

> This court has not heard a *moving*, valid reason why the court should excuse Wilcher from his abandonment request. The courts cannot be held hostage to the whim, the vacillation of a death-row inmate who, while entirely mentally competent, chooses to abandon his appeals, and later changes his mind, without any showing of sufficient excuse for the earlier action. To hold otherwise, the courts would create a special category for death-row inmates who wish to abandon judicially-approved abandonment of claims and defenses. To so hold, the courts would allow death-row inmates to play "fast and loose" with the courts. To so hold, the courts would permit death-row inmates to lengthen the appeal process, delay this execution and to frustrate justice. To so hold, the courts would open a window for death-row inmates to again and again force the courts to consider and reconsider issues of competency, no matter that such issues would have been addressed earlier.

*Id.* The district court declined to grant Wilcher the extraordinary relief under Rule 60(b)(6).

> Wilcher sought sincerely and competently to end his appeal process. This court permitted Wilcher, in accordance with his expressed wishes, to withdraw his appeals, following the directives of *Rees v. Peyton*, 384 U.S. 312, 313, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966). Nothing has been submitted by Wilcher or his attorney which would direct this court pursuant to Rule 60(b)(6) to

reinstate Wilcher's habeas corpus petition and to proceed as though he never had withdrawn it.

*Id.* at 467.

¶58.   Wilcher appealed to the Fifth Circuit, and the Fifth Circuit affirmed the district court's judgment. *Wilcher v. Epps*, 203 F. App'x 559, 563 (5th Cir. 2006). Wilcher sought a stay of execution and review by the United States Supreme Court, both of which were denied. *Wilcher v. Epps*, 549 U.S. 989, 127 S. Ct. 466, 166 L. Ed. 2d 332 (2006). Wilcher subsequently was executed by lethal injection on October 18, 2006.

¶59.   This Court holds that once the trial court determined that Cox was competent to waive present and future appeals, CPCC lacked standing to proceed on its behalf in contravention of Cox's decision. Cox constantly has reminded his attorneys that he, not they, is the ultimate decision-maker as to how his case is handled. This Court agrees with Cox that this call is his to make.

**CONCLUSION**

¶60.   This Court affirms the trial court's judgment that Cox is competent to waive all present and future appeals and that Cox, in fact, did knowingly and voluntarily waive those appeals.

¶61.   Cox repeatedly has articulated a desire to dismiss all counsel and to end all challenges to his conviction and death sentence. It is clear that Cox repeatedly has expressed that he does not want appointed counsel to take any actions contrary to his instructions. It is abundantly clear from the record presented to this Court that Cox has the mental capacity to appreciate his position and to make rational choices regarding his defense *vel non*. That

35

decision is his and his alone.

¶62.    The judgment of the trial court as to Cox's competency to dismiss his appeals is affirmed. The appeal of that judgment filed by CPCC is denied. This Court grants Cox's pro se motions to dismiss his appeals and set his execution date and denies his motions to dismiss his counsel. CPCC shall remain in an advisory role. CPCC lacks standing to proceed on Cox's behalf and pursue further hearings in contravention of Cox's decision.  All other pending motions and appeals are denied, consistent with this opinion.

¶63.    **AS TO NO. 2015-DR-00978-SCT: POST-CONVICTION RELIEF DENIED. AS TO NO. 2021-CA-00515-SCT: AFFIRMED.**

**KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.  KING, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**